UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
AP LINKS, LLC and ST. ANNES
DEVELOPMENT COMPANY, LLC,

         Plaintiffs,    <u>MEMORANDUM & ORDER</u>
                09-CV-5437(JS)(AKT)

    -against-

JAY EDMUND RUSS and RUSS & RUSS P.C.,

         Defendants.
------------------------------------X
APPEARANCES
For Plaintiffs:   Kenneth Adam Novikoff, Esq.
        Laura L. Shockley, Esq.
        Rivkin Radler, LLP
        EAB Plaza, 926 RXR Plaza
        Uniondale, NY 11556

        Steven B. Gould, Esq.
        Brown & Gould, LLP
        7700 Old Georgetown Road, Suite 500
        Bethesda, MD 20814


For Defendants:   Nicholas P. Chrysanthem, Esq.
        Marshall Dennehey Warner Coleman & Goggin
        Wall Street Plaza
        88 Pine Street, 21st Floor
        New York, NY 10005

        Caitlin Nell Nutter, Esq.
        McManus & Richter PC
        48 Wall Street, 25th Floor
        New York, NY 10005

        Daniel P. Rosenthal, Esq.
        Russ & Russ, P.C.
        543 Broadway
        Massapequa, NY 11758

SEYBERT, District Judge:

This dispute arises out of a series of business dealings between AP Links, LLC ("AP Links"), St. Anne's Development Company, LLC ("SADC" and collectively, "Plaintiffs") and Global Golf, Inc. ("Global Golf"), a client of Defendant Jay Edmund Russ ("Russ") and Russ & Russ, P.C. (collectively "Defendants"). Currently pending before the Court is Defendants' motion for partial summary judgment. (Defs.' Mot., Docket Entry 173.) For the following reasons, Defendants' motion is DENIED.

BACKGROUND

I.  <u>Factual Background</u>[1]

AP Links and SADC are limited liability companies operated by Maryland residents Aaron Young ("Young") and Peter Rubin ("Rubin"). (Defs.' 56.1 Stmt., Docket Entry 174, ¶¶ 6-7; Pls.' 56.1 Counterstmt., Docket Entry 177, ¶¶ 82-84.) Global Golf was operated by Neal Trabich ("Trabich"), a New York resident, and was engaged in the golf course management business.[2] (Pls.' 56.1 Counterstmt. ¶¶ 85-86.) In 2000, AP Links and Global Golf entered

---

[1] The following material facts are drawn from Defendants' Local Civil Rule 56.1 Statement and Plaintiffs' Local Civil Rule 56.1 Counterstatement. Any relevant factual disputes are noted. All internal quotation marks and citations have been omitted.

[2] According to Trabich, from approximately 2000 and 2006, he developed a personal and business relationship with Young. (Pls.' Counterstmt. ¶ 104; Sept. 14 Trial Tr., Pls.' Ex. 15, Docket Entry 177-15, 40:19-41:5.)

into a consulting agreement (the "Consulting Agreement") whereby AP Links agreed to provide consulting services to Global Golf "with respect to the development, management and operation of golf courses and/or related activities." (Defs.' 56.1 Stmt. ¶¶ 3, 9.) As part of that transaction, AP Links loaned Global Golf $600,000, and Global Golf agreed to pay AP Links $720,000 during the term of the agreement. (Pls.' Counterstmt. ¶¶ 89, 91; Defs.' 56.1 Stmt. ¶ 1; Sept. 14 Trial Tr., 41:20-42:1; Consulting Agreement, Pls.' Ex. 16, Docket Entry 177-16, ¶ 4.)[3] The parties dispute whether any consulting services were ever provided by AP Links, and Defendants claim that the consulting fees were "disguised interest."[4] (Defs.' 56.1 Stmt. ¶¶ 19-22; Pls.' 56.1 Counterstmt. ¶¶ 96-103.) At some point, Global Golf refused to continue paying AP Links. (Defs.' 56.1 Stmt. ¶ 18.)

The current dispute centers around a facility agreement (the "Facility Agreement") signed by SADC, Trabich, Trabich's wife ("Mrs. Trabich or T. Trabich" and, together with Trabich, "the Trabiches"), and their business partners Ron and Irene Coruzzi

_____

[3] With the exception of trial and deposition transcripts, the Court will use the pagination assigned by the Electronic Case Filing System when referring to the exhibits.

[4] Defendants allege that the members of AP Links--Young and Rubin--had no experience developing, managing or operating a golf course when the Consulting Agreement was signed. (Defs.' 56.1 Stmt. ¶ 10, 12-17.) Plaintiffs contend that "AP Links was ready, willing and able to provide consulting services . . . and in fact did." (Pls.' 56.1 Counterstmt. ¶ 10.)

("the Coruzzis") on May 2, 2006. (Defs.' 56.1 Stmt. ¶ 52; Pls.' 56.1 Counterstmt. ¶ 115.) Pursuant to the Facility Agreement, SADC arranged "a facility for Trabich with a third party lender . . . to enable it to borrow on a revolving credit basis up to One Million ($1,000,000) Dollars . . . to help finance the construction of the Saint Anne[']s golf course, together with a 30,000 square foot clubhouse . . . situated in the Town of Middletown, New Castle County, Delaware." (Pls.' 56.1 Stmt. ¶ 117; Facility Agreement, Pls.' Ex. 23, Docket Entry 177-23, at 1.) The Trabiches and the Coruzzis agreed to pay SADC "a fee of ten (10%) percent per annum upon all principal amounts borrowed by Trabich from the Facility," and "an annual consulting fee" of $100,000 per year for the first ten years and $75,000 per year for the remaining ten years. (Defs.' 56.1 Stmt. ¶ 53; Pls.' 56.1 Counterstmt. ¶ 118; Facility Agreement ¶ 2(a)-(b).)

Additionally, "as security for the performance of [their] obligations" under the Facility Agreement, Mrs. Trabich agreed to deliver "to SADC as mortgagee an original fully executed and notarized mortgage" on the Trabiches' home in Laurel Hollow, New York (the "Property") in the amount of $1,000,000 (the "SADC Mortgage"). (Defs.' 56.1 Stmt. ¶ 54; Pls.' 56.1 Counterstmt. ¶ 119; Facility Agreement ¶ 3.) However, SADC agreed not to record the mortgage unless (1) the Trabiches and Coruzzis defaulted and the default remained uncured for ten days or (2) the Trabiches

received notice and gave consent. (Defs.' 56.1 Stmt. ¶ 55; Pl.'s 56.1 Counterstmt. ¶ 121; Facility Agreement ¶ 3.) The Trabiches represented that, at that time, the Property was encumbered only by a mortgage and lien held by Countrywide Home Loans, Inc. in the approximate amount of $1,500,000. (Pls.' 56.1 Counterstmt. ¶ 120; Facility Agreement ¶ 3(b).) They further "warrant[ed] and represent[ed], as a further condition of th[e] Agreement, that they shall not place or allow to be placed upon the Collateral Property, any further liens or other encumbrances ahead of SADC and the Mortgage executed SADC as security for and accompanying this Agreement."[5] (Facility Agreement ¶ 3(b).) After the agreement was executed, SADC arranged the credit facility, Mrs. Trabich delivered the mortgage to SADC, and SADC did not record the mortgage. (Defs.' 56.1 Stmt. ¶ 54; Pls.' 56.1 Counterstmt. ¶¶ 123-25; Sept. 14 Trial Tr. 74:21-75:12.) By the end of that month, Trabich had borrowed the entire amount available under the line of credit. (Pls.' 56.1 Counterstmt. ¶ 123; Sept. 14 Trial Tr. 75:8-12.)

Several months later, in the fall of 2006, the Trabiches retained Defendants. (Defs.' 56.1 Stmt. ¶ 23; Pls.' 56.1 Counterstmt. ¶ 126; Russ Dep., Pls.' Ex. 25, Docket Entry 177-25,

_____

[5] Plaintiffs allege that Trabich separately promised Young that he would notify Young if the couple's financial situation changed so that SADC could record its mortgage. (Pls.' 56.1 Counterstmt. ¶ 122.)

73:15-18.)[6]  According to Russ, he was retained to assist with the Trabiches "legal and financial issues."[7]  (Russ Dep. 73:19-24.) Although the Trabiches and Russ did not execute a written fee agreement, Russ later testified that he believed the parties had an "understanding . . . that [he] would charge for [his] services . . . [g]enerally by the hour."  (Russ Dep. 76:13-25.)  Based on a series of e-mails between Trabich and Russ, Plaintiffs allege that the Trabiches wanted to pay off the $1,000,000 loan, and in order to accomplish this, Trabich and Russ discussed strategies for nullifying the Facility Agreement and the Consulting Agreement. (Pls.' 56.1 Counterstmt. ¶¶ 130-34.)  Plaintiffs allege that Trabich and Russ discussed the possibility of litigation, including seeking to void the agreements based on a criminal usury theory.  (Pls.' 56.1 Counterstmt. ¶ 131.)  However, Plaintiffs allege that Trabich and Russ abandoned those efforts after reviewing the relevant law.  (Pls.' 56.1 Counterstmt. ¶ 134.)

Thereafter, Russ testified that he approached Gordon Lenz ("Lenz") to gauge his interest in purchasing one of Global Golf's assets--the rights to manage the golf course concessions at

---

[6] Although Defendants did not specify the exact date, they allege that the Facility Agreement was executed before they were retained.  (Defs.' 56.1 Stmt. ¶ 56.)

[7] Defendants allege that Trabich considered Russ' advice to be legal advice, not business advice.  (Defs.' 56.1 Stmt. ¶¶ 24-26.)  Plaintiffs deny that Russ provided only legal advice. (Pls.' 56.1 Counterstmt. ¶ 24.)

Bethpage State Park (the "Bethpage Transaction").[8]  (Pls.' 56.1 Counterstmt. ¶¶ 87, 137; Sept. 14 Trial Tr. 34:7-36:14; Russ Dep. 95:24-96:8.)  Russ testified that either he or an attorney in his office formed a limited liability company called Confer Bethpage ("Confer Bethpage") to facilitate the transaction, and Lenz was the sole member.  (Pls.' 56.1 Counterstmt. ¶¶ 139-40; Russ Dep. 102:7-21, 105:14-18.)  In December 2006, the State of New York approved the assignment of the license to Confer Bethpage, and Global Golf and Confer Bethpage executed an Asset Purchase Agreement (the "APA").  (Defs.' 56.1 Stmt. ¶¶ 27-28; Pls.' 56.1 Counterstmt. ¶¶ 163-64.)  The parties also entered into an escrow agreement whereby Russ was designated as the escrow agent for the Bethpage Transaction.  (Defs.' 56.1 Stmt. ¶¶ 31-32.)  Pursuant to the APA, Confer Bethpage agreed to pay $2,400,000 for the license and related assets.  (Pls.' 56.1 Counterstmt. ¶ 164; APA, Pls.' Ex. 6, Docket Entry 177-6, at 2.)  Lenz also loaned Mrs. Trabich $500,000, and in exchange, Mrs. Trabich granted Lenz a mortgage on the Trabiches' home in Laurel Hollow (the "Lenz Mortgage"). (Defs.' 56.1 Stmt. ¶¶ 37-38; Pls.' 56.1 Counterstmt. ¶ 173.)  The Lenz Mortgage was recorded on January 5, 2007.  (Defs. 56.1 Stmt. ¶ 39.)

---

[8] Plaintiffs allege that Lenz and Russ were "long-time close friend[s]."  (Pls.' 56.1 Counterstmt. ¶ 135.)

Russ' role in the Bethpage Transaction is disputed by the parties. For example, Plaintiffs allege that Russ represented both parties to the transaction. (Pls.' 56.1 Counterstmt. ¶ 171.) They allege that a questionnaire submitted to New York State in connection with the Bethpage Transaction was completed by Russ on Lenz's behalf. (Pls.' 56.1 Counterstmt. ¶ 162.) Further, the questionnaire lists Russ as "counsel" and the "authorized contact for this questionnaire." (Questionnaire, Pls.' Ex. 36, Docket Entry 177-36, at 1.) In subsequent statements, both Trabich and Lenz testified that they believed that Russ was representing both parties.[9] (Pls.' 56.1 Counterstmt. ¶¶ 168-69; Lenz Dep., Pls.' Ex. 11, Docket Entry 177-11, 123:10-13; Trabich 2008 Dep., Pls.' Ex. 2, Docket Entry 177-2, 299:11-22.) However, Russ testified that "as a technical matter . . . [he] was the attorney for Global Golf and representing the seller" and explained this to Lenz, but that due to their long-standing relationship, Lenz "always [saw] [Russ] as a person responsible to him."[10] (Russ Dep. 80:15-81:24.) Russ also testified that as far as he knew, Confer Bethpage and

---

[9] When Russ was asked whether he received conflict of interest waivers, he testified that he did not receive written waivers, but he believed he received a verbal conflict of interest waiver from Lenz or Confer Bethpage. (Pls.' 56.1 Counterstmt. ¶ 172; Russ Dep. 82:14-22.) Defendants allege that the escrow agreement contained "Waiver of Conflict clauses." (Defs.' 56.1 Stmt. ¶ 34.)

[10] Russ also said that he felt responsible to Lenz in connection with the Bethpage Transaction. (Russ Dep. 81:25-82:4.)

Lenz were not being represented by separate counsel. (Pls.' 56.1 Counterstmt. ¶ 170; Russ Dep. 89:11-20.) Plaintiffs allege that Russ and Trabich agreed that Russ would be paid a "finder's fee" if the sale of the Bethpage license was successful. (Pls.' 56.1 Counterstmt. ¶ 129.) At his deposition, Russ testified that he did not believe that they agreed on a finder's fee, but "there was a suggestion . . . that [he] might be entitled to a bonus or finder's fee or something in relation to the Bethpage transaction." (Russ Dep. 77:4-10.) As part of the Bethpage Transaction, Trabich was also offered a position with Confer Bethpage. (Russ Dep. 150:22-25.)

The Trabiches later testified that they knew that granting the mortgage to Lenz was a violation of the Facility Agreement with SADC.[11] (Pls.' 56.1 Counterstmt. ¶ 174; Trabich 2008 Dep. 278:14-280:7; T. Trabich 2009 Dep., Pls.' Ex. 38, Docket Entry 177-38, 421:16-422:7.) However, the parties dispute whether Russ advised the Trabiches to execute the Lenz Mortgage. Plaintiffs allege that Mrs. Trabich granted Lenz the mortgage "based on advice received from Russ." (Pls.' 56.1 Counterstmt. ¶ 174.) Specifically, Mrs. Trabich testified during a deposition that she granted Lenz the mortgage "because [she] felt that the

_____

[11] Plaintiffs allege that Trabich and Lenz believed that Russ was representing both the Trabiches and Lenz in the loan transaction. (Pls.' 56.1 Counterstmt. ¶¶ 175-76.)

[Facility Agreement] . . . would not be valid" based on discussions with Russ. (T. Trabich 2009 Dep., 421:23-422:7.) However, Defendants allege that the "decision to breach the SADC Facility Agreement was not based on advice of counsel" and refer to Trabich's testimony from a 2008 deposition to that effect. (Defs.' 56.1 Stmt. ¶ 74.) Defendants also allege that Russ "did not advise Neal Trabich not to tell Plaintiffs about the filing of the Lenz [M]ortgage."[12] (Defs.' 56.1 Stmt. ¶ 73.) The parties also dispute whether the Lenz Mortgage and the Bethpage Transaction were connected; Plaintiffs allege that Lenz would not have loaned the Trabiches $500,000 if the sale to Confer Bethpage did not go through, while Defendants allege that there was "no link" between the loan and the assignment transaction. (Defs.' 56.1 Stmt. ¶ 75; Pls.' 56.1 Counterstmt. ¶ 180.)

On November 3, 2006, in the midst of negotiations with Lenz, Russ filed a lawsuit on behalf of the Trabiches against, among others, AP Links and SADC, seeking a judgment declaring the Consulting Agreement and the Facility Agreement to be void. (Defs.' 56.1 Stmt. ¶ 57; Pls.' 56.1 Counterstmt. ¶¶ 143-44.) Trabich later confirmed that the purpose of the lawsuit was to "reduce the amount of payments to the maximum extent possible under

---

[12] Regarding other mortgages on the Property, Lenz testified that he learned from Russ that "there was at least one mortgage on [the] house." (Pls.' 56.1 Counterstmt. ¶ 179; Lenz Dep. 72:5-12.)

the law." (Sept. 14 Trial Tr. 113:2-6; Pls.' 56.1 Counterstmt. ¶ 145.) Several days later, Trabich contacted Russ. (Pls.' 56.1 Counterstmt. ¶ 151.) Plaintiffs allege that Trabich "wanted to 'make a deal' with SADC to restructure or eliminate some of the SADC loan." (Pls.' 56.1 Counterstmt. ¶ 151; Nov. 9 Email, Pls.' Ex. 32, Docket Entry 177-32.) They further allege that "Russ exerted enormous control and influence over Trabich and strongly advised Trabich not to contact Young," a member of AP Links and SADC.[13] (Pls.' 56.1 Counterstmt. ¶ 152.) Young later testified that he did not become aware of the lawsuit until February 2007. (Pls.' 56.1 Counterstmt. ¶¶ 153-61; Sept. 15 Trial Tr., Pls.' Ex. 13, Docket Entry 177-13, 386:15-19.) The lawsuit was eventually dismissed due to a forum selection clause designating Maryland as the proper venue for any dispute. (Defs.' 56.1 Stmt. ¶ 58; Facility Agreement ¶ 9 at 5.)

A wave of litigation in Maryland and New York followed. SADC sued the Trabiches and Corruzzis for breach of contract and fraud, and AP Links sued Global Golf, the Trabiches, Lenz and Confer Bethpage for breach of contract and related claims. SADC and AP Links prevailed in their respective cases. (Pls.' 56.1

---

[13] Russ wrote to Trabich, "Should you approach this CREDITOR before making some moves and taking some needed precautions? . . I think NOT. Neal, do as you wish . . . but if I'm at the helm of this wooden, broken, damaged, sinking ship for the moment, then please go below deck . . . oh, put on your life jacket . . ." (Nov. 9 Email (alterations in original).)

Counterstmt. ¶¶ 185-90, 193; Aug. 2010 Order, Defs.' Ex. I, Docket Entry 180-1, at 1-2; AP Links v. Global Golf Docket Sheet, Pls.' Ex. 42, Docket Entry 177-42, at 23.) SADC also brought suit against Lenz, and SADC and Lenz eventually settled that case. (Pls.' 56.1 Counterstmt. ¶ 191; SADC v. Lenz Docket Sheet, Pls.' Ex. 44, Docket Entry 177-44, at 15-16.) Additionally, Lenz and Russ sued SADC and Young for defamation in connection with statements allegedly made by Young to local newspapers.[14] (Pls.' 56.1 Counterstmt. ¶¶ 200-01.) The defamation case was later dismissed. (Pls.' 56.1 Counterstmt. ¶ 205.)

As discussed, Russ was the escrow agent for the Bethpage Transaction. (Defs.' 56.1 Stmt. ¶ 32.) On January 25, 2007, shortly after the transaction closed, Russ paid his firm $250,000 from the escrow account. (Pls.' 56.1 Counterstmt. ¶ 220; Escrow Stmt., Pls.' Ex. 54, Docket Entry 177-54, at 1.) Defendants allege that this payment was compensation for legal work. (Defs.' 56.1 Stmt. ¶ 76.) They point to Trabich's 2012 testimony that the

---

[14] Around this time, there were several newspaper stories about the Trabiches. Specifically, Trabich pleaded guilty to grand larceny, forgery, offering a false instrument and bribery on August 12, 2008. (Defs.' 56.1 Stmt. ¶ 48.) Trabich was subsequently terminated by Confer Bethpage. (Pls.' 56.1 Counterstmt. ¶ 196.) Plaintiffs allege that Russ drafted an Acknowledgement and General Release, pursuant to which Trabich released Confer Bethpage from all claims and received severance payments, "on behalf of Confer Bethpage and negotiated its terms with Confer Bethpage on behalf of Mr. Trabich." (Pls.' 56.1 Counterstmt. ¶¶ 197-98.)

payment was for "legal fees." (Defs.' 56.1 Stmt. ¶ 76; Trabich 2012 Dep., Defs.' Ex. P, Docket Entry 174-1, at 49, 145:18-20.) Defendants further allege that Trabich "agreed on and approved the payment," that the legal fees were "reasonable and fair based on the work that had been done," and that Russ "would not make any payments out of the escrow without consulting with [ ] Trabich" based on Trabich's testimony in 2012. (Defs.' 56.1 Stmt. ¶¶ 77-78, 80.) Plaintiffs admit that Trabich approved the $250,000 payment, but allege that the payment was a finder's fee related to the Bethpage Transaction.[15] (Pls.' 56.1 Counterstmt. ¶¶ 77, 223.) For support, they point to Russ' testimony that he did not document the time he spent on the Bethpage Transaction and did not provide a bill to the Trabiches; rather, he testified that they discussed the work he had done and agreed on an appropriate fee. (Pls.' 56.1 Counterstmt. ¶¶ 221-22; Russ Dep. 89:21-91:9.) In 2015 depositions, the Trabiches both referred to the $250,000 payment as a "finder's fee." (Pls.' Counterstmt. ¶ 224; Trabich 2015 Dep., Pls.' Ex. 7, Docket Entry 177-7, 238:6-12; T. Trabich 2015 Dep., Pls.' Ex. 55, Docket Entry 177-55, 47:7-17.) In 2008 and 2009,

---

[15] Plaintiffs further allege that Trabich later questioned whether Defendants' fees were reasonable and that he did not approve every payment made from the account. (Defs.' 56.1 Stmt. ¶¶ 78, 80; Pls.' 56.1 Counterstmt. ¶¶ 78, 80.) Plaintiffs also claim that certain payments from the account to Defendants in 2009 were not supported by any records, and when asked, Russ could not recall the legal services performed that led to those payments. (Pls.' 56.1 Counterstmt. ¶¶ 225-26.)

Plaintiffs allege that Russ made payments to an attorney representing Russ and Lenz in the defamation case and Lenz in the separate case against him filed by SADC, despite the fact that there was no written agreement that Global Golf would pay such fees.[16] (Pls.' 56.1 Counterstmt. ¶¶ 229-44.)

As discussed, the Lenz Mortgage was recorded on January 5, 2007. (Defs. 56.1 Stmt. ¶ 39.) In 2008, Lenz commenced a foreclosure action, but discontinued the action on May 3, 2010. (Defs.' 56.1 Stmt. ¶¶ 60-61; Foreclosure Conf. Part Order, Defs.' Ex. W, Docket Entry 174-2, at 72.) On April 6, 2007, SADC recorded its mortgage and subsequently commenced a foreclosure action. (Defs.' 56.1 Stmt. ¶¶ 62-63.) Judge Karen V. Murphy ("Judge Murphy") of the Supreme Court, Nassau County dismissed SADC's foreclosure action on April 28, 2008 ("Murphy Decision"). (Defs.' 56.1 Stmt. ¶ 64; Murphy Decision, Defs.' Ex. Y, Docket Entry 174-3, at 49.) She found that Plaintiff "ha[d] failed in its burden to show a default under the mortgage," because the foreclosure action was based on the Trabiches' breach of the Facility

---

[16] Interestingly, before Trabich was deposed in this action, Russ forwarded him a copy of Russ' deposition transcript and asked him to read it. (Pls.' 56.1 Counterstmt. ¶ 255; Nov. 18 Email, Pls.' Ex. 57, Docket Entry 177-57.) Trabich responded, "[a]s Abe Lincoln would have stated: 'I will not divide this Union on principles that are based on man's inhumanity to man.' Gould must yield to our will! I have completed the reading of the document and noted all salient points. I await our meeting." (Nov. 19 Email, Pls.' Ex. 58, Docket Entry 177-58.) Trabich and Russ then arranged a meeting. (Nov. 19 Email.)

Agreement, and those promises "d[id] not appear in the mortgage agreement . . . [or] in the non-existent note." (Murphy Decision at 51.) She also noted that it was possible the foreclosure action could proceed based on non-payment of the underlying debt, but "there [was] no default in payment alleged." (Murphy Decision at 51.) Finally, Judge Murphy declined to grant SADC a preliminary injunction to prevent the Trabiches from further encumbering the Property because SADC recording its mortgage guaranteed SADC priority over any junior lienholders. (Murphy Decision at 52.)

II. Procedural History

Plaintiffs commenced this lawsuit on December 11, 2009. (Compl., Docket Entry 1.) The Complaint asserts claims on behalf of AP Links for breach of fiduciary duty and breach of a duty to a third party beneficiary and a claim on behalf of SADC for tortious interference with contract. (Compl. ¶¶ 68-82.) Plaintiffs demand $3,809,792.70 in compensatory damages and at least $3,000,000 in punitive damages. (Compl. at 15.) On September 14, 2010, Defendants filed a motion to dismiss, which was denied by Judge Thomas C. Platt on March 14, 2011.[17] (Mot. to Dismiss, Docket Entry 16; March 2011 Order, Docket Entry 20.) Relevant to this motion, Judge Platt held that Plaintiffs stated a claim for tortious interference because "[a]lthough normally an

_____

[17] The case was reassigned to the undersigned on July 8, 2014. (See July 8, 2014 Electronic Order.)

15

agent may not be held liable for inducing its principal to breach,"
in light of Plaintiffs' allegation that "Russ colluded with Trabich
and Lenz in his capacity as a broker and as an attorney . . . Russ
acted outside the realm of agent." (March 2011 Order at 16.)
Defendants filed their Answer on April 7, 2011. (Answer, Docket
Entry 23.) Discovery was contentious, and the parties litigated
numerous discovery disputes.

On June 14, 2016, Defendants filed a motion for partial
summary judgment on the tortious interference claim only. (Defs.'
Mot., Docket Entry 173.) Defendants are not moving on the
fiduciary duty and third party beneficiary claims. On July 18,
2016, Plaintiffs filed their opposition brief, and Defendants
filed their reply brief on July 29, 2016. (Pls.' Opp., Docket
Entry 176; Defs.' Reply, Docket Entry 180.) On August 3, 2016,
Plaintiffs filed a motion to strike a section of Defendants' reply
brief. (Mot. to Strike, Docket Entry 182.) Defendants opposed
the motion to strike on August 17, 2016, and Plaintiffs filed a
reply brief in further support of their motion on August 30, 2016.
(Defs.' Strike Opp., Docket Entry 183; Pls.' Strike Reply at 185.)

DISCUSSION

I. <u>Motion to Strike</u>

Plaintiffs move to strike the arguments under Point I
and under sections A and B of the Preliminary Statement in
Defendants' reply brief. (Pls.' Strike Br., Docket Entry 182-1,

16

at 1.)  Plaintiffs argue that these sections of Defendants' reply advance a new argument--specifically, that Plaintiffs cannot prove "but for" causation.  (Pls.' Strike Br. at 1.)  Plaintiffs contend that in Defendants' opening brief, they argued that the SADC Mortgage was unenforceable because it did not secure a note or the promises in the Facility Agreement, and a result, SADC cannot show actual damages.  (Pls.' Strike Br. at 2.)  However, Plaintiffs argue that in the reply, Defendants raised a different argument-- that "Plaintiff's damages argument is premature because it cannot prove that 'but for' the alleged interference by the Russ Defendants . . . the Trabiches would have performed under the Facility Agreement."  (Pls.' Strike Br. at 2.)

Defendants respond that the 'but for' causation argument was rebutting the arguments in Plaintiffs' opposition, and as such, the 'but for' causation argument was properly raised.  (Defs.' Strike Opp. at 1.)  Further, they contend that Plaintiffs' opposition "obscure[d] the inherent requirement that damages be causally related to the [D]efendant's conduct," and they were entitled to rebut that argument.  (Defs.' Strike Opp. at 1.)  Defendants also claim that they raised a causation argument in their opening brief because they referred to the fact that the Facility Agreement had already been breached.  (Defs.' Strike Opp. at 4.)  On reply, Plaintiffs contend that the "but for" causation

argument was not responsive to the arguments in their opposition. (Pls.' Strike Reply at 2-4.)

Generally, a "'[a]rguments may not be made for the first time in a reply brief.'" Zirogiannis v. Seterus, Inc., 221 F. Supp. 3d 292, 298 (E.D.N.Y. 2016) (quoting Knipe v. Skinner, 999 F.2d 708, 711 (2d Cir. 1993)) (alteration in original). As a result, arguments raised for the first time in a reply brief should be disregarded unless the arguments respond to "new material issues raised in the opposition papers." Gayle v. Harry's Nurses Registry, No. 07-CV-4672, 2012 WL 4174401, at *1 (E.D.N.Y. Sept. 18, 2012), aff'd, 594 F. App'x 714 (2d Cir. 2014) (internal quotation marks and citation omitted); see also Zirogiannis, 221 F. Supp. 3d at 298.

The Court finds that Defendants' "but for" causation argument, raised for the first time in their reply brief, is a new argument that is not responsive to the arguments in Plaintiffs' opposition. Defendants did not argue in their opening brief that there was no "but for" causation due to the Trabiches' prior breach of the Facility Agreement. While Defendants mentioned the purportedly "undisputed" fact that there had been a prior breach, they did not attribute any significance to this fact or rely on it to support their arguments. (See Defs.' Br., Docket Entry 173-11, at 4 n.4, 5-6.) In their opposition, Plaintiffs discussed the measure of damages for tortious interference and Defendants'

argument that the SADC Mortgage was unenforceable. (Pls.' Opp. at 8-17.)  Neither of these arguments implicated causation. Accordingly, Plaintiffs' motion to strike (Docket Entry 182) is GRANTED.  The Court will not consider the causation argument under Point I and sections A and B of the Preliminary Statement in Defendants' reply brief.

It is worth noting that even if the Court considered Defendants' causation argument, summary judgment is not warranted based on the record before this Court.  Throughout their briefs, Defendants allege that it is undisputed that the Trabiches breached the Facility Agreement prior to the retention of Defendants; however, they fail to cite any evidence in the record to establish this.  (See, e.g., Defs.' Br. at 4 n.4, 5-6.)  For example, Defendants cite two documents in their reply brief to attempt to establish this fact--their own memorandum of law and a Memorandum Opinion by Judge William D. Quarles, Jr. in the Maryland action, neither of which is sufficient to establish that the Trabiches breached the Facility Agreement prior to the alleged interference by Defendants.[18]  (See Defs.' Reply Br., Docket Entry 181, at 2, 6.)  Under Federal Rule of Civil Procedure 56, "[a] party asserting

---

[18] Judge Quarles' finding was based on evidence presented during a bench trial.  (Quarles Decision, Defs.' Ex. I, Docket Entry 180-1.)  Defendants have not pointed to any evidence related to this issue in the record before this Court, nor did they include it as an undisputed fact in their Rule 56.1 Statement.

that a fact cannot be . . . genuinely disputed must support the
assertion by . . . citing to particular parts of materials in the
record, including depositions, documents, electronically stored
information, affidavits or declarations, stipulations[,] . . .
admissions, interrogatory answers, or other materials." FED. R.
CIV. P. 56(c)(1)(A); see also Nnebe v. Daus, 644 F.3d 147, 156 (2d
Cir. 2011). Establishing the Trabiches' prior breach is essential
to Defendants' causation argument and Defendants have failed to
cite any evidence establishing that fact. Thus, Defendants'
causation argument, even if properly raised, would not be
successful.

II. <u>Motion for Summary Judgment</u>

Summary judgment will be granted where the movant
demonstrates that there is "no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of law."
FED. R. CIV. P. 56(a). A genuine factual issue exists where "the
evidence is such that a reasonable jury could return a verdict for
the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.
242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed 2d 202 (1986). In
determining whether an award of summary judgment is appropriate,
the Court considers the "pleadings, deposition testimony, answers
to interrogatories and admissions on file, together with any other
firsthand information including but not limited to affidavits."
<u>Nnebe</u>, 644 F.3d at 156.

The movant bears the burden of establishing that there are no genuine issues of material fact. Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994). Once the movant makes such a showing, the non-movant must proffer specific facts demonstrating "a genuine issue for trial." Giglio v. Buonnadonna Shoprite LLC, No. 06-CV-5191, 2009 WL 3150431, at *4 (E.D.N.Y. Sept. 25, 2009) (internal quotation marks and citation omitted). Conclusory allegations or denials will not defeat summary judgment. Id. However, in reviewing the summary judgment record, "'the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'" Sheet Metal Workers' Nat'l Pension Fund v. Vadaris Tech. Inc., No. 13-CV-5286, 2015 WL 6449420, at *2 (E.D.N.Y. Oct. 23, 2015) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997)).

To prevail on a tortious interference claim in New York, a plaintiff must show: "(1) the existence of a valid contract between the aggrieved party and a third party; (2) the alleged tortfeasor's knowledge of the contract; (3) the alleged tortfeasor's improper intentional interference with its performance without justification; and (4) damages." Lader v. Delgado, 941 F. Supp. 2d 267, 272 (E.D.N.Y. 2013); see also Bernberg v. Health Mgmt. Sys., Inc., 303 A.D.2d 348, 349, 756 N.Y.S.2d 96, 98 (2d Dep't 2003).

At a minimum, there is an issue of fact as to whether Russ advised the Trabiches to execute the Lenz Mortgage and breach the Facility Agreement. Recognizing this, Defendants have focused exclusively on the damages element in their motion. (Defs.' Br., at 2, 13.)  First, Defendants argue that, even if Plaintiffs could prove that Defendants tortiously interfered with the Facility Agreement, they are entitled to summary judgment because Plaintiffs cannot establish actual damages. (Defs.' Br. at 12-18.)  Second, they argue that this controversy is moot. (Defs.' Br. at 18-20.)

A. Actual Damages

Defendants argue that the tortious interference claim must be dismissed because Plaintiffs cannot show actual damages. (Defs.' Br. at 1.)  They contend that "Plaintiff[s] ha[ve] not been damaged as a matter of law by the breach of the promise by the Trabiches not to further encumber the Trabich property," because "Plaintiff[s] could never obtain lien priority regardless of where in the chain of title its mortgage was recorded." (Defs.' Br. at 2.)  Defendants claim that this is true for two reasons: first, the mortgage "did not provide for foreclosure in the event of a breach of the promises made in the Facility Agreement" and thus, the Facility Agreement was not secured by the mortgage, and second, there was no "[n]ote between Plaintiff[s] and the Trabiches given as security for the mortgage." (Defs.' Br. at 2.)  Although

the mortgage refers to a note, Defendants allege that no note between SADC and Mrs. Trabich exists, and because the mortgage secured this missing note, it could not have been intended to secure the promises in the Facility Agreement. (Defs.' Br. at 15.) Moreover, Defendants contend that New York law prohibits promises like the Trabiches' promise not to encumber from securing a mortgage. (Defs.' Br. at 17.) Defendants equate the existence of actual damages with the ability to foreclose and argue that because Plaintiffs could not foreclose, there are no actual damages. (Defs.' Br. at 2, 17.) As support, Defendants cite the decision of Judge Murphy dismissing SADC's foreclosure action. (Defs.' Br. at 3.)

Plaintiffs respond that Defendants "fundamentally misunderstand the proper measure of damages," and point out that under New York law, SADC is entitled to the damages it suffered as a result of the Trabiches' breach of the Facility Agreement. (Pls.' Opp. at 2.) Specifically, they contend that "the issue is not whether a specific monetary damage can be tied to the discrete act of recording the Lenz [M]ortgage," but rather what the "full value of the contract [is] that the Trabiches breached when they permitted the recordation of the Lenz [M]ortgage." (Pls.' Opp. at 10 (emphasis in original).) They claim that as a result of the breach of the Facility Agreement, Defendants are responsible for the $1,000,000 borrowed pursuant to the credit facility plus a ten

percent fee and $1,750,000 in consulting fees.[19]  (Pls.' Opp. at

11.)  Moreover, Plaintiffs contend that even if the mortgage is

unenforceable, Mrs. Trabich had a duty to remedy any defects and

deliver a valid mortgage pursuant to the provisions of the Facility

Agreement.  (Pls.' Opp. at 2-3.)  Plaintiffs maintain that

"Defendants are simply incorrect that the mortgage was not

enforceable," because "[t]here is no question that the mortgage

delivered to SADC was intended to secure all of the Trabiches'

obligations in the Facility Agreement." (Pls.' Opp. at 3 (emphasis

in original).)  They point to case law which provides that if a

mortgage reflects an intent to secure an underlying debt, it is

enforceable even in the absence of a note.  (Pls.' Opp. at 14.)

Finally, they contend that while the foreclosure action was

dismissed, Judge Murphy found that the mortgage was enforceable

against junior lienholders, and as such, the mortgage is valid.

(Pls.' Opp. at 15-16.)

On reply, Defendants emphasize that the mortgage is not

enforceable because it is "defective in content—-not in form," and

---

[19] Plaintiffs allege that, after the Trabiches defaulted on the
$1,000,000 loan arranged by SADC, SADC was required to pay off
the loan in full pursuant to a separate indemnification
agreement.  As a result, Plaintiffs claim, SADC suffered the
entire $1,000,000 loss.  (Pls.' Opp. at 11 n.8.)  In regard to
the consulting fees, Plaintiffs argue that the Facility
Agreement contained an acceleration clause, pursuant to which
Defendants are responsible for "all monies due, but unpaid,
under the Facility Agreement."  (Pls.' Opp. at 12-13.)

argue that the fact that the mortgage is recorded does not mean that Plaintiffs can foreclose on the mortgage. (Defs.' Reply at 3, 8 (emphasis in original).) Further, Defendants argue that the Court should reject Plaintiffs' invitation to "re-write its fatally defective mortgage" given the absence of a note and Judge Murphy's conclusion that a note does not exist. (Defs.' Reply at 8-9.)

"It is well-settled that, under New York law, a plaintiff in a tortious interference with contract case is entitled to damages in the amount of the full pecuniary loss of the benefits of the contract, and that 'the elements of damages, including consequential damages, [are] those recognized under the more liberal rules applicable to tort actions.'" Int'l Minerals and Resources, S.A. v. Pappas, 96 F.3d 586, 597 (2d Cir. 1996) (quoting Guard-Life Corp. v. S. Parker Hardware Mfg. Corp., 50 N.Y. 2d 183, 197 n.6, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1980)) (alteration in original). Damages for tortious interference can include "'(a) the pecuniary loss of the benefits of the contract . . . ; (b) consequential losses for which the interference is the legal cause; and (c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference.'" Pappas, 96 F.3d at 597 (quoting Restatement (Second) of Torts § 774A (1977)). Thus, "the damages for a tortious interference claim are linked to the damages for the breach of the underlying

contract." Design Partners, Inc. v. Five Star Electric Corp., No. 12-CV-2949, 2017 WL 818364, at *15 n.18 (E.D.N.Y. Mar. 1, 2017).

Consistent with these principles, if Plaintiffs can show at trial that Defendants tortiously interfered with the Facility Agreement between Plaintiffs and the Trabiches, Plaintiffs are entitled to the "full pecuniary loss of the benefits of th[at] contract." Pappas, 96 F.3d at 598. Defendants have cited no authority specifying a different measure of damages nor have they argued that the well-established case law in this area does not apply. Additionally, the Court has been unable to locate any authority to support an alternative measure of damages. Therefore, Defendants' arguments addressing the validity of the SADC Mortgage are misplaced, and the Court declines to opine on its validity.

Based on the relevant law and the existence of clear issues of fact related to the remaining elements of Plaintiffs' claim, the Court DENIES summary judgment on this ground.

B. Mootness

Alternatively, Defendants argue that because the Lenz Mortgage is "invalid and dischargeable," the tortious interference claim is moot. (Defs.' Br. at 3-4.) Specifically, they contend that because Lenz's time to foreclose has elapsed under New York Real Property and Procedures Law Section 1501(4), SADC now has the priority for which it bargained. (Defs.' Br. at 18-20.) Plaintiffs respond that dismissal on mootness grounds is not

appropriate because "the Lenz [M]ortgage recordation damaged SADC the moment it went on record, thereby depriving SADC a material protection to which it was entitled." (Pls.' Opp. at 3.) They also argue that "SADC went without the benefit of the protection for which it bargained . . . for <u>seven</u> <u>years</u>," and that "Defendants do not and cannot assert that the lapse of the Lenz [M]ortgage somehow provided SADC the full pecuniary benefits of the Facility Agreement." (Pls.' Opp. at 18 (emphasis in original).)

The Constitution "restricts the power of the federal courts to 'Cases' and 'Controversies.'" <u>Chafin v. Chafin</u>, 568 U.S. 165, 172, 133 S. Ct. 1017, 1023, 185 L. Ed. 2d 1 (2013). "There is . . . no case or controversy, and a suit becomes moot, when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." <u>Chafin</u>, 568 U.S. at 172, 133 S. Ct. at 1023, 185 L.Ed.2d 1 (internal quotation marks and citation omitted); <u>see</u> <u>also</u> <u>N.Y. City Emps.' Ret. Sys. v. Dole Food Co., Inc.</u>, 969 F.2d 1430, 1433 (2d Cir. 1992). However, "a case becomes moot only when it is impossible for a court to grant any effectual relief what[so]ever to the prevailing party." <u>Chafin</u>, 568 U.S. at 172, 133 S. Ct. at 1023, 185 L. Ed. 2d 1 (internal quotation marks and citation omitted). Additionally, the determination as to whether a case should be dismissed on mootness grounds "'lies within the sound discretion of the district court . . . .'" <u>Davis v. City of N.Y.</u>, 812 F. Supp. 2d 333, 339

(S.D.N.Y. 2011) (quoting Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo, 981 F.2d 50, 59 (2d Cir. 1992)).

The fact that the Lenz Mortgage may be unenforceable at this point does not moot this case.  As Plaintiffs point out, even if Defendants' theory about the enforceability of the Lenz Mortgage is correct, the SADC Mortgage was subordinated to the Lenz Mortgage for approximately seven years.  (Pls.' Opp. at 18.)  During those years, Plaintiffs claim that they were deprived of the protection promised to them in the Facility Agreement and that they suffered damages as a result.  Accordingly, the mootness doctrine has no application here, and Defendants' motion for partial summary judgment on mootness grounds is DENIED.

<u>CONCLUSION</u>

Plaintiffs' motion to strike (Docket Entry 182) is GRANTED, and Defendants' motion for partial summary judgment (Docket Entry 173) is DENIED.  The parties shall file letters within fourteen (14) days of the date of this Memorandum and Order setting forth their respective positions on scheduling a settlement conference with Judge Tomlinson.

SO ORDERED.


/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:     August   7  , 2017
           Central Islip, New York